IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT L. KING, JR., and<br>DORIS REGINA KING, h/w, | CIVIL ACTION |
| Plaintiffs, | |
| v. | No. 13-6663 |
| ROCKTENN CP, LLC<br>(AS CORPORATE SUCCESSOR TO<br>SMURFIT STONE CONTAINER<br>CORPORATION), | |
| Defendant. | |

MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                 MAY 8, 2015

      Presently before this Court is Defendant, Rocktenn CP, LLC's, Motion for Summary Judgment, the Response in Opposition filed by Plaintiffs, Robert L. King Jr. and Doris Regina King, and Defendant's Reply thereto. For the reasons set forth below, Defendant's Motion is granted.

**I.    BACKGROUND**

    **A.    Facts**

      Plaintiffs, Robert L. King, Jr. ("King") and Doris Regina King (collectively, "Plaintiffs"), are adult citizens of the state of New Jersey. Am. Compl. ¶ 1. Defendant, RockTenn CP, LLC ("Defendant"), is a Delaware corporation with its corporate headquarters located in Georgia. Id. ¶ 2. At all times relevant to this litigation, Defendant operated a place of business located at 9820 Blue Grass Road in Philadelphia, Pennsylvania (hereinafter the "premises"). Id. The

premises consisted of a large parking lot with several loading docks connected to a warehouse building. (See Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J.; Ex. F: Video.)

At all times relevant to this action, King was employed by Lily Transportation as a yard jockey, and worked solely at the premises. (King Dep. p. 38:1-2, May 14, 2014.) While working at the premises, King operated as a business invitee of Defendant. Am. Compl. ¶ 8. As a yard jockey, King's job was to hook and unhook trailers in order to move them in and out of the loading docks. (King Dep. p. 38:4-11.) King primarily worked in an area of the premises that consisted of six docks where trailers could connect to the building, which are labeled one to six. (Id. p. 131:23-24.)

The Philadelphia area experienced significant snowfall on January 26, 2011, with accumulations totaling 14.2 inches, and additional snow totaling 0.9 inches on January 27, 2011, and 0.1 inch on January 28, 2011. (See Pls.' Resp. in Opp'n, Ex. B: Nat'l Climatic Data Center (Snow totals for Phila. Int'l Airport, Jan. 2011).) On the afternoon of January 27, 2011, King started work at 3:00 p.m., and was scheduled to work until 6:00 a.m. the following morning. (King Dep. p. 52:18-22.)

When King started his shift on January 27, 2011, the conditions at the premises were as follows. The parking lot surrounding the premises was "plowed and cleared up." (Id. p. 68:3-5.) The area between the trailers was not cleared of snow and/or ice, which was the typical practice at the premises.[1] (McVeigh Dep. p. 39:4-7 & p. 40:3, May 14, 2014; Bilbili Dep. p. 36: 17.) However, this area had been salted. (King Dep. p. 57:11-15.) The presence of snow and ice on the ground was apparent to King. (Id. p. 59:1-4.) Prior to starting his shift, King inspected the premises where he would be working, and stated that "from seeing what I saw, it looked like a

---

[1] This was a typical practice because the snowplow was too large to get into the area between the trailers. (Bilbili Dep. p. 36: 14-20, Aug. 19, 2014.)

2

regular, typical safe day to do my job that day," and that the areas in between the trailers were "safe enough for me to do my job." (Id. pp. 68:20-21, 69:4-7, 71-72:23-2.) Although King could have notified his supervisor, Fredi Bilbili ("Bilbili"), of any snow or ice and have the area salted, he did not take such action. (Id. p. 71:5-12; p. 146:18-20.)

Sometime in the morning hours before 6:00 a.m., King received a call directing him to remove the trailer that was currently positioned at door six of the loading dock, and replace it with another designated trailer. (Id. p. 73:10-12.) Prior to the call, King asserts that he had not worked in the area of door six during his shift. (Id. p. 70:9-12.) In order to complete this task, King had to hook the trailer onto a tractor. (Id. p. 73:13-18.) Because the overhead light affixed to the warehouse building is on the passenger side of the tractor, it is dark on the driver's side where King had to hook in the trailer. (Id. p. 55:11-17.) King was grasping a "hold bar" attached to the tractor with his left hand in order to steady himself while hooking the tractor to the trailer. (Id. p. 73:20-24.) After successfully completing the hookup, King slipped while "maneuvering" to get back into the tractor. (Id. p. 84:16-18.) Upon slipping, all of King's weight shifted onto his left shoulder causing a "pop." (Id. p. 74:1-3; 86:7-11.) King then fell and landed on his backside. (Id. p. 86:19.) Despite the pain in his shoulder, King, not only finished his shift, he worked overtime until his relief arrived for work. (Id. p. 74:20-24.) After work, King immediately sought medical attention. (Id. p. 120: 15.) Initially, King was diagnosed with a shoulder sprain (Id. p. 185:4-5), but later, an MRI showed tears in his shoulder (Id. p. 186:1-2.), which required surgery. (Id. p. 198:4-6.)

### B. Procedural History

On October 11, 2013, Plaintiffs filed an Amended Complaint against Defendant alleging negligence and loss of consortium. See Am. Compl. In general, the suit alleges that Defendant

was negligent in maintaining the premises from the dangers of snow and ice on the date of King's fall, and that Defendant's negligence was the direct and proximate cause of the injuries suffered by King. (Id. ¶¶ 22-26.)

On November 15, 2013, Defendant removed this action based on diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1441 to the United States District Court for the Eastern District of Pennsylvania. (See Doc. No. 1.) After a series of extensions, Defendant filed the instant Motion for Summary Judgment on March 16, 2015. (See Doc. No. 34.) Plaintiffs filed a Reply in Opposition on March 30, 2015, to which Defendant submitted a Reply on April 8, 2015. (See Doc. No. 37; see also Doc. No. 40.)

## II. STANDARD OF LAW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992).  "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996).  If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

### III.    DISCUSSION

As a federal court sitting in diversity, we must apply the substantive laws of the State of Pennsylvania. Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990).  Under Pennsylvania law, "the standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespasser, licensee, or invitee." Carrender v. Fitterer, 503 Pa. 178 (1983) (citing Davies v. McDowell Nat. Bank, 407 Pa. 209, 213 (1962)).  In this case, the parties agree that King was a business invitee to the premises where the alleged accident occurred.  (Def.'s Mot. for Summ. J. at 5; Pls.' Resp. in Opp'n at 9.)  A business invitee is a "person who is invited to enter or remain on land for a purpose directly or indirectly connected with the business dealings with the possessor of the land." Charlie v. Erie Ins. Exch., 100 A.3d 244, 253 (Pa. Super. 2014) (quoting Restatement (Second) of Torts, § 332 (1965)).

5

The Motion for Summary Judgment filed by Defendant is premised on two distinct legal theories that act to absolve a landowner of liability under Pennsylvania law.  First, Defendant asserts that its liability is negated by the Hills and Ridges Doctrine ("H&R Doctrine") because Plaintiffs cannot show that an unreasonable accumulation of snow or ice was in the area of the incident.[2]  Second, Defendant argues that, pursuant to the Assumption of Risk Doctrine, it lacked any duty to King since he continued to engage in an obvious and known danger.  After careful review, we find the second premise to be determinative, and thus, we solely address this issue.

In Carrender v. Fitterer, 503 Pa. 178 (1983), the Supreme Court of Pennsylvania, relying heavily upon the Restatement (Second) of Torts ("Restatement"), set forth the applicable standard of care owed to invitees and its relationship to the assumption of risk doctrine.  As a general rule, a possessor of land owes a duty to an invitee to protect him or her from foreseeable harm.  Carrender, 503 Pa. at 185 (citing Restatement, §§ 341A, 343 & 343A).  However, this duty and its accompanying liability extend only where the possessor:

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitee, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

---

[2] The H&R Doctrine is an exception to the general duty owed by a property owner, which relieves a property owner from liability for general slippery conditions caused by ice and snow.  See Wentz v. Pennswood Apts., 518 A.2d 314, 316 (Pa. Super. Ct. 1986).  It is a doctrine rooted in practicality "for to require that one's walks be always free of ice and snow would be to impose an impossible burden in view of the climatic conditions in this territory."  Id. (citing Rinaldi v. Levine, 406 Pa. 74, 78 (1962)).  Thus, the H&R Doctrine acts to "to protect possessors of land by increasing, not decreasing, the proof required before a plaintiff can recover for injuries sustained as a result of a fall on an ice or snow covered surface."  Id.

Id. (citing Restatement § 343A).  As such, "[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Id.

"A danger is deemed to be 'obvious' when 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment.'" Id. at 185 (quoting Restatement (Second) of Torts § 343A cmt. B).  "For a danger to be 'known,' it must 'not only be known to exist, but . . . also be recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated.'" Id.  "Although the question of whether a danger was known or obvious is usually a question of fact for the jury, the question may be decided by the court where reasonable minds could not differ as to the conclusion." Id. (citing Restatement (Second) of Torts § 328B cmts. c and d).

The Carrender Court explained the relationship between the assumption of risk doctrine and the rule that a possessor of land is not liable to his invitees for obvious dangers as follows:

> When an invitee enters business premises, discovers dangerous conditions which are both obvious and avoidable, and nevertheless proceeds voluntarily to encounter them, the doctrine of assumption of risk operates merely as a counterpart to the possessor's lack of duty to protect the invitee from those risks.  By voluntarily proceeding to encounter a known or obvious danger, the invitee is deemed to have agreed to accept the risk and to undertake to look out for himself.  It is precisely because the invitee assumes the risk of injury from obvious and avoidable dangers that the possessor owes the invitee no duty to take measures to alleviate those dangers.  Thus, to say that the invitee assumed the risk of injury from a known and avoidable danger is simply another way of expressing the lack of any duty on the part of the possessor to protect the invitee against such dangers.

Id. at 187-88 (citations omitted).

In Carrender, the Appellee, a business invitee, parked in the lot of the Appellant. Id. at 181. A sheet of ice covered the area where Appellee parked; however, the remainder of the parking lot, which contained open parking spaces, was free of ice and snow. Id. 181-83. The Appellee was aware of the icy surface under her feet.[3] Id. at 182. After safely navigating the ice on her way into the building, the Appellee slipped and fell on the way back to her car fracturing her hip. Id. at 183. The Appellee, subsequently, filed a suit sounding in negligence against the Appellant for failing to maintain the premises. Id. The Pennsylvania Supreme Court, in reversing the decision of the Superior Court and finding for the Appellant, held that, since the danger posed by the ice was both obvious and known, the duty element essential to a claim of negligence was not satisfied. Id. at 187. The Court's conclusion was based upon Appellee's own testimony, which demonstrated that she was aware of the ice, and that she appreciated the risk of traversing it. Id. at 186.

In this case, the application of the assumption of risk doctrine depends on whether the dangers encountered by King from the snow and ice were "known and obvious." It is Defendant's position that it lacked any duty to King because "King assumed any potential risk when he continued to work despite knowledge of snow and ice on January 27 and 28, 2011, and as a general condition that could be encountered in truck yards." (Def.'s Mot. for Summ. J. 8.) On the contrary, Plaintiffs argue that the danger of snow and ice was not "known and obvious" to King because he had not worked in the area during his shift prior to his fall and because the area was dark. (Pls.' Resp. in Opp'n 16.) Furthermore, Plaintiffs contend that summary judgment is

---

[3] The danger of the ice to Appellee was further exacerbated by the fact that she wore a prosthesis consisting of an artificial lower leg. Carrender 503 Pa. at 182.

not warranted on this issue because reasonable minds could differ as to the "known and obvious" nature of the danger.  (Id.)

Applying the framework set forth in Carrender to the facts of this case, we find that the snow and ice constituted an "obvious and known" danger to King.[4]  This conclusion reflects our view that, not only would a reasonable person recognize the presence of the condition and the risk apparent to them, but also that, based on the record, King also recognized such danger.  See Carrender, 503 Pa. at 185.

Here, there is a significant amount of convincing evidence that, on the date of the fall, the dangers of snow and ice were known to King.  The fact that the Philadelphia area received a significant amount of snowfall around the time in question is undisputed.  (See Pls.' Resp. in Opp'n, Ex. B:  Nat'l Climatic Data Center.)  King inspected the "outside yard" prior to his shift, as was his usual practice (King Dep. pp. 71-72:23-2), and admitted that he was aware of the presence of snow and ice on the ground.  (Id.   p. 59:1-4.)  King had experience working during snowstorms, and on most of such occasions, he admitted that snow and ice were present between trailer areas one to six.  (Id. p. 157:2-11.)  On the date of his fall, King noted that the area in between the trailers, though not plowed, was salted.  (Id. p. 57:11-15.)  Most significantly, King admitted that anyone working on the day of his fall would have known of the ice and snow between the trailers.  (Id. p. 138:2-7.)  Bilbili corroborated this sentiment when he testified that King complained about the snow and ice to him during his shift prior to his fall.  (Bilbili Dep. p. 43-44:22-4.)  Finally, the videos of the premises, taken by King and attached by Plaintiffs as an exhibit to their Response in Opposition, provide visible supporting evidence of King's

---

[4] A federal court sitting in diversity "is bound to follow state law as announced by the highest state court." Nuveen Mun. Tr. v. Withumsmith Brown P.C., 752 F.3d 600, 602 (3d Cir. 2014).

knowledge. King introduces the videos by asserting that the conditions portrayed are consistent with how the conditions would have been on the day of his fall. (King Dep. p.128:15.) It is evident from viewing the videos and by King's own admission, that the majority of the alleys between the trailers had openly visible amounts of snow and ice. (Id. p. 126:8.)

The testimony of Sommorow Bryant ("Bryant"), a warehouse worker on the premises, further substantiates our finding that King knew of the dangers. Bryant testified that, after a snowstorm, the area between the trailers would be a "mess" (Bryant Dep. p. 43:10, Mar. 18, 2015), and that on the date of King's fall the yard was a "sloppy mess" (Id. p. 60:5) with the areas in between the trailers being "messy." (Id. p. 60:10-12.) In addition, her testimony that, after a snowstorm, the presence of snow and ice was visible (Id. p. 50:6) and "obvious" (Id. p. 46: 18), and everyone in the department knew it (Id. p. 51:16.), refutes any possibility that King was unaware of the conditions. In fact, Bryant goes so far as to assert that the presence of such conditions between the trailers after a snowstorm was so typical that you could count on it being there. (Id. p. 49:8-12.) The testimony of Bilbili echoes Bryant's sentiment. Bilbili stated that yard jockeys regularly worked when it was snowing and icy, that the area in between the trailer usually contained snow and ice in such conditions, and that yard jockeys were aware of such conditions. (Bilbili Dep. pp. 50:20-23; 51:24; 57:8-10; 58:20-21.)

Finally, the site of his fall and the length of his shift further support the conclusion that King knew of the dangers in that specific area. The actual site where King fell was one of the six main docks, and King described it as generally being "real busy." (King Dep. p. 43:3-5, 16-17.) On the date of the fall, King worked a fifteen hour shift. (Id. p. 57:11-15.) Completing his main task of hooking up and moving trailers required him to regularly maneuver in the alleys between the trailers. (Id. p. 131:9-16, 23-24.) Bryant, Bilbili and James McVeigh, a maintenance

manager at the premises, testified that it was typical practice for this area between the trailers to not be plowed or shoveled.  (Bryant Dep. p. 42:14-15; Bilbili Dep. p. 36:17; McVeigh Dep. p. 39:4-7 & p. 40:3, May 14, 2014.)  In the aggregate these facts indirectly reinforce our conclusion that King was aware of dangerous conditions at the site of his fall.  See Carrender, 503 Pa. at 185.

## IV.   CONCLUSION

Based upon the aforementioned insurmountable direct and indirect evidence presented to the Court, we conclude that reasonable minds could not differ as to the fact that the dangerous conditions on January 28, 2011, were "obvious and known" to King prior to his fall.  Therefore, we hold that King assumed the risk of injury when he continued to work at the premises.  Consequently, we grant Defendant's Motion for Summary Judgment on this ground.  In consideration of this ruling, the Court additionally dismisses Plaintiffs' loss of consortium claim.  See Craig v. Franklin Mills Assocs., L.P., 555 F. Supp. 2d 547, 555 (E.D. Pa. 2008) ("If the underlying negligence claim brought by the claimant's spouse is dismissed, however, the loss of consortium claim must also be dismissed.")

An appropriate Order follows.